IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

KATHRYN REITZ,                          )
                                        )
        Plaintiff,                      )       CASE NO. 3:08-cv-00728
                                        )
VERSUS                                  )       JUDGE TRAUGER
                                        )
CITY OF MT. JULIET,                     )       MAGISTRATE JUDGE BRYANT
                                        )
        Defendant.                      )

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The Plaintiff, Kathryn Reitz, was an employee at will of the City of Mt. Juliet, working as a

clerk in the City's Stormwater department, an entry-level position responsible for answering the

telephone, taking information from citizens and developers, and maintaining the Stormwater

department's voluminous files.  Ms. Reitz was counseled and written up for repeated tardiness and

poor organization of the department files (including many missing documents, and even missing fee

checks) many times during her tenure with the City of Mt. Juliet.

The material facts are not in dispute with respect to any of the issues in this case.

Reitz felt the "clerk" position for which she applied was a stepping stone for which she was

overqualified.  After she had been employed with the City for approximately six months, and no

promotion was forthcoming, Ms. Reitz filed a sexual harassment complaint with the City on April 5,

2007, alleging instances of purported harassment.  After an extremely detailed investigation by an

outside investigator, the City determined there was no merit to Ms. Reitz's allegations.

Unfortunately, Ms. Reitz was not satisfied with the City's investigation, and she admits she

carried a tape recorder to work almost daily and used her cellphone camera to attempt to photograph

employees and other things in the office.  Despite her daily carrying of the tape recorder and frequent

display of it to antagonize her co-workers, no tapes or photographs of any kind were produced in Ms.

1

Reitz's answers to interrogatories, responding instead that none existed. Ms. Reitz was not disciplined in any way despite this caustic and antagonistic behavior. Ms. Reitz was even offered another position in the City's police department, so she could extricate herself from the environment she apparently disliked, but Ms. Reitz declined.

Ms. Reitz was repeatedly and habitually tardy. Eventually, after Ms. Reitz's timeliness did not improve, she was suspended for four days, and cautioned to improve her work performance. Additionally, Ms. Reitz was counseled and reprimanded because her files in the Stormwater department were in disarray, with documents and even fee checks from developers frequently missing. A management action plan was created by the City's new public works director on January 31, 2008, in an attempt to give everyone guidelines for a "new day" of improved performance and conduct. Rather than embracing the new public works director's efforts to improve the department, Ms. Reitz threatened to bring her tape recorder. Her performance did not improve. She continued to be tardy, and her files continued to be disorganized. Her continued performance deficiencies and habitual tardiness resulted in her termination on April 25, 2008.

Ms. Reitz filed this Title VII lawsuit. The lawsuit claims discrimination, first alleged in an April 5, 2007 internal complaint to the City. In addition, her lawsuit alleges that the City retaliated against her since that initial complaint was filed. The City and its employees did not discriminate against or sexually harass Ms. Reitz at any time, and the extensive investigation into Ms. Reitz's sexual harassment complaint determined that there was merit to her allegations.

Moreover, the City and its employees did not retaliate against Ms. Reitz. On the contrary, Ms. Reitz antagonized her co-workers by waving a tape recorder in their faces, and used her cellphone to photograph people and objects in the office. Ms. Reitz's reprimands for habitual tardiness and poor organization of the department files for which she was responsible, the eventual suspension when her performance did not improve, and finally the termination, were all legitimate and proper, and not done for any retaliatory, discriminatory, or other improper purpose, and are not actionable under Title VII.

2

The Defendant is entitled to summary judgment on Ms. Reitz's hostile work environment and discrimination claim, as well as her retaliation claim, and this case should be dismissed.

**FACTS**

The material facts are not in dispute.

The Plaintiff, Kathryn Reitz (hereinafter "Reitz"), was employed by the Defendant, the City of Mt. Juliet (hereinafter "City"), from October 16, 2006 until April 25, 2008 as the clerk in the City's Stormwater department. [Gaskin affidavit]. Very shortly after she was hired, Reitz's supervisor, Gary Gaskin (hereinafter "Gaskin") told Reitz that it was very important that she do a good job, because the department was under heavy scrutiny, that everyone's job was on the line, including Gaskin's own:

> Q.    And he told you to really try and do a good job because even his own job was in jeopardy, right?
>
> A.    Right.
>
> Q.    And it wasn't just you and it wasn't just him; it was everybody in the city, right?
>
> A.    That's what he said.
>
> Q.    All right. Men and women?
>
> A.    I assume so, yes. [Reitz depo., p. 259, lines 5-12]

Reitz began having problems with punctuality right away, including the first few months of work, before she had ever asserted any discrimination or harassment. Reitz admits that she was counseled weekly for tardiness, before she filed any sexual harassment complaint.

> Q.    All right. And so if you told her that Gary had reprimanded you about your time card weekly for months, that would have been true, right?
>
> A.    If I told her that, yes.
>
> Q.    All right.
>
> A.    If that's what's in there and I wrote it, yes.
>
> Q.    All right. And if you wrote that to her on May 17th, 2007, then that indicates that he had been doing that for months, including the period of time prior to your April 5th, 2007, complaint, right?

3

A.      Right.

Q.      All right.  This is that document, isn't it, Ms. Reitz, that you produced in your answers to interrogatories?

A.      To the best of my knowledge, yes.  [Reitz Depo., p. 257, lines 12-25; p. 258, lines 1-2].

As the problem continued unabated, Gaskin continued counseling Reitz.  [Gaskin Affidavit].

Reitz admits she was late to work multiple times, and she was reprimanded multiple times.

Q.      -- the question is very simple.  Have you been late to work multiple times?

A.      Yes.

Q.      And Gary Gaskin reprimanded you for being late to work multiple times, right?

A.      Right.  [Reitz Depo., p. 260, lines 16-21].

In November 2007, Reitz was suspended for four days as a result of her continued habitual

tardiness.  [Reitz Depo., p. 357, lines 16-22].  Reitz admits that the City Manager, Randy Robertson,

had been made aware that she had been tardy many, many times, and was even late on the very day she

was suspended.

Q.      He had received information from his employees that you had been subpar at your work performance, that you had been late many, many times, that you had been written up many, many times, and that you were late again on that very day, and that a suspension was warranted; is that right?

A.      Yes.  [Reitz Depo., p. 357, lines 16-22].

Reitz's job was an entry-level job whose responsibilities were entirely clerical.  [Reitz Depo. p.

136, lines 19-25; p. 137, lines 1-3].  Simply being at work on time, at her desk able to answer the

phone, and keeping the department's files organized, were Reitz's only principal responsibilities.

Q.      The job, as you were hired to do it by Hatton Wright, was a clerk job, an entry-level basic job, right?

A.      Right.

Q.      Your job was to answer the phones and take information from citizens or developers, right?

A.  Right.

Q.  Your job was to receive paperwork, process it, and file it, right?

A.  Right.  [Reitz Depo., p. 136, lines 19-25; p. 137, lines 1-3].

In addition to being habitually tardy, Reitz did not keep the Stormwater files organized and failed to take and receive the proper information from citizens and developers.  [Gaskin Affidavit].  She received numerous reprimands for her deficient organization, including disorganized files.

Q.  And you were also written up for your interactions with citizens or developers isn't that right?

A.  Actually, I'm not sure what this says.  "Paperwork was absent, incomplete."  This doesn't say anything about developers or builders.

Q.  A precon meeting is a meeting with the developers and builders, right?

A.  Yes.  [Reitz Depo., p. 339, lines 17-25].

                    *                    *                    *

Q.  All right.  On July the 10th, you were written up regarding calendaring of information, scheduling of meetings.  And it mentions that this has occurred on at least two prior occasions, doesn't it?

A.  I'm not finished reading this.   Actually, I was written up for scheduling meetings and then reprimanded for scheduling meetings.  [Reitz Depo., p. 340, lines 21-25; p. 341, lines 1-4].

                    *                    *                    *

Q.  On July 20th, you were written up again, weren't you?  This time for not providing complete and correct information on forms, is that right?

A.  The date on there is the July 20th.  [Reitz Depo., p. 353, lines 20-23].

                    *                    *                    *

Q.  On October the 11th, you were written up for incorrect filing of documents, right?

A.  That is dated October 11th.  Again, I don't recall that I saw that.
    [Reitz Depo., p. 354, lines 15-18].

                    *                    *                    *

5

Q.    How many times were you written up at the City of Mt. Juliet?

A.    I have no idea.  Many, many, many times, by the looks of those, but most of them I was never told about.  [Reitz Depo. p. 355, lines 16-20].

Reitz continued to frequently arrive at work late, right up until she was terminated in April 2008. [Reitz Depo., p. 343, lines 11-13; p. 344, lines 20-22].  In fact, a memo was circulated discussing timecards on April 1, 2008, and Reitz was late to work the very next day, April 2, 2008.  [*Id*].  She sent an e-mail to the public works director, Marlin Keel, acknowledging her tardiness.  [*Id*].

Ultimately, Reitz had been late to work so many times, she stated she could not even recall how many times she had been late or when:

Q.    You had been late lots of times, hadn't you?

A.    I don't recall.

Q.    You continued to be late even in April, 2008, right before you were terminated, weren't you?

A.    I don't recall.

Q.    After all these issues occurred in August, you continued to be late in September of 2007, didn't you?

A.    I don't recall. [Reitz Depo., p. 349, lines 3-11].

Despite the City's efforts, Reitz's performance and punctuality never improved.  [Gaskin Affidavit].  The City made every effort to improve the situation, including implementing an action plan in 2008.  [Keel Affidavit].  Reitz acknowledged that it was essential to be punctual and for the files to be organized.

Q.    Well, aside from the document, don't you think that's an important goal?

A.    All those things that you just mentioned?

Q.    Yes.

A.    Could you mention them again?

Q.    Yes.  To have people come to work on time, to have files organized and complete and accurate, and to have a functional and efficient office environment.

6

A.      Sure.

Q.      And isn't that the goal for employees of the City of Mt. Juliet, regardless of whether a formal plan is created or not?

A.      Sure.

Q.      But the fact that these supervisors and managers took the steps to create a formal plan with you is just a further reinforcement of that obvious goal; is that right?

A.      I don't know what – I can't recall.

Q.      All right.  You received the stormwater management action plan; is that right?

A.      I have my signature on the bottom, and I remember an action plan. [Reitz Depo., p. 380, line 25; p. 381, lines 1-22].

Unfortunately, Reitz's performance with the City did not improve, even after the City implemented the action plan, and Reitz was terminated on April 25, 2008.  [Keel Affidavit].  There is no evidence that Reitz was terminated for any improper motive, or that Reitz was discriminated against or retaliated against in any way, beyond Reitz's subjective belief.

ALLEGATIONS OF DISCRIMINATION AND HOSTILE WORK ENVIRONMENT

On April 5, 2007, approximately six months after her employment began, Reitz filed a complaint with the City, purporting to allege sexual harassment.  [Reitz Depo., Ex. 16, p.1]. According to the Complaint filed in this lawsuit, the alleged sexual harassment was based on 1) receiving "several sexually oriented e-mails"; 2) being "subjected to unwelcome conversation" where a former City employee was allegedly referred to "as being menopausal or peri-menopausal"; and 3) "unwelcome sexual innuendo" from Plaintiff's supervisor that "she should 'take her husband home and be nice to him'" and "another occasion" where the supervisor "discussed his male anatomy." [Complaint ¶ 7(a,b, & c)].

The City referred Reitz's sexual harassment complaint to an outside investigator, who extensively investigated the complaint and conducted over 25 witness interviews.  [Reitz depo., Ex. 16,

7

p. 3]. Despite the exhaustive investigation, the investigator found there was no sexually hostile work environment. [Reitz depo, Ex. 16, p. 17].

First, Reitz admitted in her deposition that the e-mail she referred to in her sexual harassment complaint was a cartoon e-mail discussing the unpleasantness of mammograms, sent by a female employee to seven of her female co-workers, and one male, and not a sexual act. [Reitz depo., p. 158, lines 12-25].

Q. Did it appear to be a suggestion that mammograms were uncomfortable or unpleasant?

A. I would say that was one of the points. (Deposition of Reitz, page 146, lines 3-5.)

Reitz complained about this e-mail to her supervisor, and she never received any other offensive or explicit e-mails from that sender. [Reitz depo., p. 148, lines 10-14]. In fact, Reitz did not receive any other offensive or explicit e-mails from any other City employees during the entire year and a half she worked for the City.

Q. Can you describe any other sexually offensive or explicit email from any other City of Mt. Juliet employee to you?

A. I don't recall. (Deposition of Kathryn Reitz, Vol. I, page 155, lines 21-24).

        *                    *                    *

Q. As we sit here today, you cannot describe one; is that right or wrong?

A. Right, that's right. (Deposition of Kathryn Reitz, Vol. I, page 156, lines 8-10).

Second, assuming for the purpose of this motion that a statement that a former employee was "menopausal or peri-menopausal" was actually made,[1] this was a single, isolated incident; there is no evidence that it was intended to be demeaning as opposed to a statement of a person's health condition. [Reitz Depo., Ex. 16, p. 12]. The investigator found no pervasive sexually hostile environment. [*Id*].

Finally, the investigator could not substantiate Reitz's allegations regarding her supervisor, finding them to be unreliable. [Reitz depo., Ex. 16, p. 13]. The investigator noted that Reitz did not

---

[1] The City employees accused of this vehemently deny that such a comment was actually made.

include any allegation regarding Gaskin in her initial written complaint, and Reitz did not mention it at all during the investigator's first two extensive interviews with her. [*Id.*] Reitz made the allegations concerning Gaskin for the very first time during the third interview. [*Id.*] Assuming these statements were actually made,[2] the investigator concluded that these remarks could not rise to a severe and pervasive hostile work environment. [*Id.*]

<u>ALLEGATIONS OF RETALIATION</u>

Plaintiff's Complaint alleges that she was retaliated against for filing the April 5, 2007 sexual harassment complaint. [Complaint ¶ 8]. Specifically, she makes six allegations: 1) she was wrongfully accused of being late to work; 2) she received complaints about her attendance and work quality; 3) her supervisor failed to take her calls or respond to her requests; 4) she was denied an opportunity to be trained; 5) she was denied a merit raise; and 6) she was reprimanded for being late when her timecard was hidden. [Complaint ¶ 8 (a-f)].

First, Plaintiff admitted she actually was late to work multiple times, for which she was properly reprimanded:

Q.  -- the question is very simple. Have you been late to work multiple times?

A.  Yes.

Q.  And Gary Gaskin reprimanded you for being late to work multiple times, right?

A.  Right. [Reitz Depo., p. 260, lines 16-21].

Despite Reitz's habitual tardiness and poor work quality, (discussed *supra* pp. 3-7), Reitz was given a raise on April 16, 2007, less than two weeks after filing her harassment complaint, by the very person she complained about, the public works director, Hatton Wright.

Q.  You received a raise on April 16, 2007, from $12.15 an hour to $13.18 an hour; is that right?

A.  Yes.

---

[2] Gaskin denies that either such a comment was actually made.

Q.     The person who signed off and approved that raise was Hatton Wright, isn't it?

A.     Yes.

Q.     That's the person that you complained about in your complaint, isn't it?

A.     Yes.  [Reitz Depo., p. 238, lines 1-9].

Reitz's complaint that she did not receive training demonstrates that she felt her job as clerk was beneath her, and expected the City to give her a better job with more meaningful responsibilities. [Reitz Depo. p. 131, lines 4-14].  She understood, however, that her job as clerk was an entry-level job with minimal responsibility, and there is no evidence that a failure to train was improperly motivated. Reitz acknowledged her job as "clerk" consisted only of:

Q.     Pushing papers, answering phones, processing documents, talking to people, taking, you know, information down, right?

A.     Right.  [Reitz Depo., p. 40 lines 9-12].

Reitz felt she was overqualified for the position as Stormwater clerk, and expected to be promoted within six months of her hire.

Q.     Did you feel like the position of clerk was appropriate for somebody with your experience and education?

A.     **I thought it was beneath my experience**, but I – I was told that it was a good entry-level position.

Q.     Why would you apply for a job that was beneath you?

A.     There weren't a lot of jobs available.  I was told that once I had been there about six months, that I could start posting for jobs that were above that.  [Reitz Depo., p. 131, lines 4-14].

As her six month anniversary neared, in April 2007, Reitz had already been reprimanded for tardiness many times; no promotion was forthcoming; and Reitz filed a sexual harassment complaint. [Reitz Depo., p. 257, lines 12-25; p. 260, lines 16-21; Ex. 16, p.1].  The City did not retaliate against her; instead they gave her a raise.  [Reitz Depo., p. 238, lines 1-9].  The City retained an outside investigator who extensively investigated the allegations, and determined there was no merit to her

10

complaint. [Reitz depo. Ex. 16, p. 17]. Reitz has no evidence other than her own subjective belief that the City or its employees acted with an improper motive at any time. The City even created a formal action plan to try and correct the performance deficiencies, but Reitz refused to give the City a chance:

Q.    You went to that meeting with that attitude, didn't you, Ms. Reitz?

A.    With what attitude?

Q.    The attitude that it was retaliatory.

A.    It was retaliatory. Yes, I did. [Reitz Depo., p. 382, lines 23-25; p. 383, lines 1-2].

                    *                    *                    *

Q.    All right. And you did that because you had the attitude that nothing was going to be made better at the City of Mt. Juliet, right?

A.    Not by the history of the City of Mt. Juliet; you're right. [Reitz Depo., p. 383, lines 24-25; p. 384, lines 1-3].


Instead of allowing the City to make things better, Reitz began antagonizing her co-workers, carrying a tape recorder to work every day and photographing employees and the workplace with her cellphone camera. [Reitz Depo., p. 385, lines 7-13; p. 301, lines 15-18]. Her co-workers complained to the City management.

Q.    Okay. He accused you of taking a picture of him with your camera or your cell phone camera; is that right?

A.    Yes. [Reitz Depo., p. 301, lines 15-18].

                    *                    *                    *

Q.    Okay. So you did take a picture at the time this incident occurred? The fact is, your camera only captured the door?

A.    Yes. [Reitz Depo., p. 303, lines 15-18].

                    *                    *                    *

Q.    At work did you take pictures?

A.    I took pictures of the dead deer; I took pictures of the chicken leg, yes, I did.

Q.    What other things did you take pictures of at work?

A.     I took a picture of trash on my desk and dead spiders.

Q.     All right.  What else?

A.     I don't recall. [Reitz Depo., p. 302, lines 24-25; p. 303, lines 1-7].

Reitz tried to tape her co-workers; she carried her tape recorder daily; she displayed it to her

co-workers to threaten them; she even tried to tape the sexual harassment investigator, Kristen Berexa.

Q.     Why would you say, "I'll bring my tape recorder" if you would not have made a tape recording.

A.     I carried it at all times, or as much as I could.

Q.     Is it just a threat to have it handy?

A.     Made me feel safer.  [Reitz Depo., p. 385, lines 7-13].

                    *                    *                    *

Q.     Did you attempt to make tape recordings of anybody other than Gary Gaskin?

A.     Yes.

Q.     Who else did you attempt to make tape records of?

A.     Kristin Berexa. [Reitz Depo., p. 307, lines 6-16].

Reitz also admitted that taping and photographing her co-workers created discord:

Q.     If you had done that, if you had tape-recorded your coemployees or threatened to tape-record your coemployees or taken any steps to indicate that you might be tape-recording your coemployees, is that appropriate office place behavior?

A.     I  don't recall.  I remember – I don't recall. [Reitz Depo., p. 373, lines 11-18].
                    *                    *                    *

Q.     My question isn't why you did the things you did; my question is, did it create a harmonious working environment for you to do those things [attempting to tape record or photograph]?

A.     Probably not.  [Reitz Depo., p. 374, lines 17-20].

There is no evidence that the City or its employees acted improperly with respect to Reitz in

any way, other than Reitz's subjective belief.  Reitz's own conduct – her habitual tardiness and failure

12

to maintain organization of the files – was the subject of repeated reprimands and discipline from the time she started work for the City, and before any claim of sexual harassment or discrimination, until the time of her termination. [Reitz Depo., p. 260, lines 16-21; p. 349, lines 3-11; p. 257, lines 12-25]. There is no evidence of pretext in any way.

<u>LAW AND ARGUMENT</u>

## I. Hostile Work Environment and Discrimination

Reitz cannot sustain her *prima facie* case for hostile work environment and discrimination, which was the subject of her April 5, 2007 complaint to the City, because the conduct she describes in her Complaint does not rise to a severe and pervasive hostile environment. The Sixth Circuit recently explained the requirements of a claim for hostile work environment discrimination in the context of race discrimination in *Barrett v. Whirlpool Corp.*, 556 F.3d 502 (6th Cir. 2009).

> To defeat a motion for summary judgment in a discrimination case, a plaintiff must adduce direct or circumstantial evidence of discrimination. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir.2004). Direct evidence is evidence that, if believed, dictates a finding, with no need to draw inferences, that "unlawful discrimination was at least a motivating factor in the employer's actions." *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir.2006).

> Where a plaintiff relies on circumstantial evidence, the *McDonnell Douglas* burden-shifting framework applies. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). To establish a *prima facie* case of a racially hostile work environment, a plaintiff must demonstrate that (1) she was a member of a protected class; (2) she was subjected to unwelcome racial harassment; (3) the harassment was based on race; (4) the harassment unreasonably interfered with her work performance by creating an intimidating, hostile, or offensive work environment; and (5) the employer is liable. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir.1999).

> \*                    \*                    \*

> To assess the fourth prong of an asserted *prima facie* case, we must examine the totality of the circumstances. *Harris*, 510 U.S. at 23, 114 S.Ct. 367; *Thornton v. Fed. Express Corp.*, 530 F.3d 451, 455 (6th Cir.2008). In doing so, we consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367; see also *Williams v. GMC*, 187 F.3d 553, 560-62 (6th Cir.1999). "[C]onduct must be extreme to

13

amount to a change in the terms and conditions of employment...." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). "[S]imple teasing, ... offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." Id. (internal citation and quotation marks omitted).

*Id.* at 514-15.

The same analysis discussed in detail in *Barrett*, applies equally in sexual harassment and sexually hostile discrimination complaints under Title VII. *Nievaard v. City of Ann Arbor*, 124 Fed. Appx. 948, 952-53 (6th Cir. 2005). Under this analysis, Reitz cannot make out a *prima facie* case. Reitz's complaint for alleged sexual harassment is premised on a single e-mail which discussed mammograms, an isolated comment regarding a former employee as "menopausal or peri-menopausal," and two alleged off-color remarks by Reitz's supervisor Gary Gaskin. [*See* Complaint ¶ 7]. Even if it is assumed for the purpose of this motion that these comments really happened, they are isolated, minor incidents that cannot rise to a severe and pervasive hostile environment as a matter of law. Considering the four factors described by the Sixth Circuit in *Barrett*, and the totality of the circumstances, these comments are simply not sufficient to sustain a *prima facie* case of hostile work environment discrimination. The Sixth Circuit recently explained the requirement of severe and pervasive harassment:

> In contrast [to disparate treatment claims], hostile-work-environment claims "involve[ ] repeated conduct" and require the plaintiff to demonstrate that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment." Id. at 115-16, 122 S.Ct. 2061 (internal quotation marks omitted).

*Hunter v. Secretary of the Army,* 565 F.3d 986, 994 (6th Cir. 2009) (quoting *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002)).

Moreover, the City has presented evidence that entitles it to summary judgment, based on the *Faragher-Ellerth* affirmative defense to a sexually hostile work environment. The City has in place a sexual harassment policy, requiring an aggrieved party to report sexual harassment. Reitz submitted a

complaint on April 5, 2007, which was fully, completely, and exhaustively investigated by an outside investigator retained by the City.  Over 25 witness interviews were conducted.

The Sixth Circuit explained:

> To satisfy the fifth prong of the *prima facie* case, employer liability, what a plaintiff must show differs depending on whether the harassment was carried out by co-workers or supervisors. Employer liability for co-worker harassment stems directly from the employer's actions, or lack thereof, in response to the harassment: The plaintiff must show that the employer " 'knew or should have known of the charged [racial] harassment and failed to implement prompt and appropriate corrective action.' " *Hafford*, 183 F.3d at 513 (quoting *Pierce v. Commonwealth Life Ins. Co.,* 40 F.3d 796, 804 n. 11 (6th Cir.1994)). In contrast, employers are vicariously liable for harassment by supervisors, and the employee need not show that the employer had knowledge of the harassment. Id. **However, an employer can raise an affirmative defense to liability for supervisor harassment by establishing: (1) that it exercised reasonable care to prevent and correct promptly any racially harassing behavior by its supervisor, and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to otherwise avoid the harm.** See *id*. (citing *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)).

*Barrett*, 556 F.3d at 516. (emphasis added).

The City exercised reasonable care.  Reitz's complaint under the sexual harassment policy resulted in an exhaustive outside investigation.  The investigator found Reitz's complaint to be without merit.  Reitz made no further written complaint under that policy.  Thus, the City acted swiftly and responsibly when Reitz made her initial complaint on April 5, 2007, and the City has conclusively established this defense.  No tangible employment action occurred prior to the April 5, 2007 complaint. Additionally, to whatever extent Reitz now claims there was additional or subsequent harassment, she made no effort to file an additional complaint under the City's policy, and denied the City the opportunity to investigate.  Reitz admitted that she instead tried to tape and photograph her co-workers, and even the outside investigator Kristen Berexa.  [Reitz Depo., p. 307, lines 6-16].  Rather than participating in the process and giving the City the opportunity to correct any problems, Reitz became a vigilante, antagonizing her co-workers with a display of her tape recorder and cellphone camera. Thus, the City exercised reasonable care at all times; the Plaintiff acted unreasonably; and any claim

for sexually hostile work environment discrimination is barred in accordance with this established defense.

## II. Disparate Treatment

The Plaintiff's Complaint in this case makes no assertion that she was subjected to disparate treatment discrimination based on gender. Regardless, she cannot sustain a *prima facie* case of disparate treatment discrimination.

> To make out a *prima facie* case of gender discrimination [a plaintiff] must show that: (1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir.2004)….If the plaintiff meets this initial burden of establishing a *prima facie* case, then the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the plaintiff's discharge. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Once the defendant has done so, the burden reverts to the plaintiff to show that the defendant's alleged reason is a mere pretext for discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). At all times, the burden of persuasion remains with the plaintiff. *Id.*

*Grace v. USCAR*, 521 F.3d 655, 677 (6th Cir. 2008).

Reitz was not treated differently than any similarly situated employee. She can identify no comparator employee who was treated more favorably. *White v. Columbus Metropolitan Housing Authority*, 429 F.3d 232 (6th Cir. 2005) (requiring a showing of a comparator employee to sustain the fourth prong of the *prima facie* case). Thus, Reitz cannot sustain a *prima facie* case. Moreover, to whatever extent Reitz may purport to premise her suit on disparate treatment discrimination, she cannot demonstrate that her reprimands for tardiness and failing to maintain her work organization were pretextual, and the Defendant is entitled to summary judgment under the *McDonnell-Douglas* burden shifting analysis. Plaintiff has admitted that she was late to work multiple times, and that she was reprimanded for tardiness multiple times. [Reitz depo., page 260, lines 16-21 (quoted supra in <u>Facts</u> section at p. 4)].

Plaintiff cannot sustain a claim for disparate treatment discrimination, the City is entitled to summary judgment, and this case should be dismissed.

### III.  Retaliation

The Defendant is entitled to summary judgment on Reitz's claims of retaliation.  Reitz's Complaint filed in this cause identifies the specific allegations that the City retaliated against her for filing the sexual harassment complaint on April 5, 2007, ultimately culminating in her termination over one year later, on April 25, 2008.  Specifically, she makes six allegations:  1) she was wrongfully accused of being late to work; 2) she received complaints about her attendance and work quality; 3) her supervisor failed to take her calls or respond to her requests; 4) she was denied an opportunity to be trained; 5) she was denied a merit raise; and 6) she was reprimanded for being late when her timecard was hidden.  [Complaint ¶ 8 (a-f)].

> It is well established that to prevail upon a Title VII retaliation claim, "a plaintiff must establish that: (1)[he] engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir.2008).

*Thompson v. North American Stainless, LP*, 567 F.3d 804 (6th Cir. 2009).

Plaintiff has admitted that she was reprimanded for her tardiness routinely, including months prior to her first complaint of sexual harassment on April 5, 2007.  [Reitz depo., page 257, lines 12-25; page 258, lines 1-2, (quoted *supra* in <u>Facts</u> section at p. 3)].  She admitted she actually was tardy multiple times, and was reprimanded for the tardiness multiple times.  [Reitz depo., page 260, lines 16-21 (quoted *supra* at p. 4)].  Plaintiff admitted she was tardy even into April 2008, just before she was terminated, and just one day after a memorandum was distributed cautioning employees about timeliness.  [Reitz depo. p. 344, lines 20-22)  Likewise, Reitz received a raise just days after her sexual harassment complaint, from the very person about whom she complained:

Q.      You received a raise on April 16, 2007, from $12.15 an hour to $13.18 an hour; is that right?

A.      Yes.

Q.      The person who signed off and approved that raise was Hatton Wright, isn't it?

A.      Yes.

Q.      That's the person that you complained about in your complaint, isn't it?

A.      Yes.  (Deposition of Kathryn Reitz, Vol. II, page 238, lines 1-9).

Moreover, the Plaintiff has no evidence that any of the alleged instances of retaliation were causally related in any way to her Title VII complaints.

> Even assuming that the removal of Cecil's tank site duties, discipline, reduced salary increase, and discharge amounted to materially adverse actions, **Cecil must produce evidence of a causal nexus between those actions and her protected activity. Temporal proximity is usually not enough to show causation.** *Nguyen v. City of Cleveland*, 229 F.3d 559, 566-67 (6th Cir.2000); *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir.1986). "Where an adverse employment action occurs very close in time after an employer learns of a protected activity," however, temporal proximity may be enough. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir.2008). But "where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id*.

*Cecil v. Louisville Water Co.*, 301 Fed.Appx. 490, 501 (6th Cir. 2008).

Even assuming Reitz's complaints do create an inference of retaliation, the City has demonstrated a legitimate, non-discriminatory and non-retaliatory reason for her discipline and discharge:  habitual tardiness and disorganization of the files she was required to maintain as the clerk. [Affidavits of Robertson, Gasking, and Keel]. Reitz cannot carry her burden of demonstrating that this reason is pretextual, and the Defendant is entitled to summary judgment.

This Court recently held that a Plaintiff must carry the burden of proving pretext, which is more than the burden of production to sustain a *prima facie* case.  In *Eades v. Brookdale Senior Living, Inc.*, 3:07-cv-00913, 2008 WL 5095410 (M.D. Tenn., Judge Trauger, Nov. 25, 2008), this Court explained:

As the defendant has presented a legitimate, non-discriminatory reason for its actions, under the *McDonnell Douglas* framework, the burden shifts back to the plaintiff to demonstrate that this reason is, in fact, pretextual. 411 U.S. at 804. To establish pretext, the plaintiff must show that the proffered reason "(1) had no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 526 (6th Cir.2008) (citing *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir.2000)). In doing so, the plaintiff must "produce sufficient evidence from which the jury could reasonably reject the defendants' explanation and infer that the defendants did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action." *Id.* (citing *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir.2001)).

Mr. Eades first asserts that pretext is established by the temporal proximity between his complaints about Ms. Fein and his termination. (Docket No. 21 at 13-14.) In support of this argument, he relies on *Mickey*, which discusses the significance of temporal proximity between a plaintiff's protected activity and subsequent adverse employment action. *See* 516 F.3d at 525. Although *Mickey* provides that such temporal proximity is relevant to the extent that it constitutes evidence of causation for the purposes of establishing a *prima facie* case of retaliation, it does not provide that temporal proximity is relevant to establishing pretext, as Mr. Eades asserts. *See id.*; *see also Ellis v. Buzzi Unicem USA*, No. 07-5660, 2008 U.S.App. LEXIS 13498, at *27-28 (6th Cir. June 24, 2008) (holding that temporal proximity arguments "do nothing to support [a plaintiff's] burden of demonstrating [the employer's] legitimate reason for firing [the plaintiff] was pretextual," but, rather, they "merely aid [the plaintiff] in meeting his initial burden to make a *prima facie* case for retaliatory discharge"). Moreover, although Mr. Eades' termination came on the heels of his letter to Mr. Richard outlining his complaints about Ms. Fein's behavior, that letter simply reiterated complaints he had made previously, undermining Mr. Eades' argument that the proximity between his complaint and his termination should be determinative of the pretext issue.

          *                    *                    *

An employer may, indeed, have multiple legitimate reasons for terminating an employee. *See Tidwell v. Carter Prods.*, 135 F.3d 1422, 1428 (11th Cir.1998) (holding that performance could be an "additional, but undisclosed reason" for employer's decision to terminate and that "the existence of a possible additional non-discriminatory basis" for an employee's termination does not establish pretext); *Bhupendra Parikh v. Cleveland Hardware & Forging Co.*, No. 1:04-cv-2363, 2006 U.S. Dist. LEXIS 34912, at *24-25 (N.D.Ohio May 26, 2006) (noting that, where an employer asserts multiple legitimate non-discriminatory reasons for its actions, a plaintiff must demonstrate that each reason is pretextual, and holding that plaintiff had not established that multiple legitimate reasons asserted by defendant were pretextual); *Stone v. Galaxy Carpet Mills, Inc.*, 841 F.Supp. 1181, 1187 (N.D.Ga.1993) (holding that singular reason advanced by employer at time of termination was "not inconsistent with [the employer's] more developed reasons articulated on motion for summary judgment" and that the multiple reasons advanced by the employer did not establish pretext). The fact is that Mr. Eades did have performance-related issues as well as a personality conflict with Ms. Fein, and he also does not dispute his misconduct with respect to the severance package he received from his former employer. These legitimate reasons are neither inconsistent nor mutually exclusive, and Mr. Eades has provided no evidence that they were pretextual.

There is no evidence that the legitimate, non-discriminatory reasons asserted by the defendant as the basis for Mr. Eades' termination, taken either individually or collectively, had no basis in fact, did not motivate the defendant's conduct, or were insufficient to motivate the defendant's conduct. Therefore, Mr. Eades has not established pretext and the defendant's motion for summary judgment on his retaliation claims will be granted.

*Id.* at *6-*8.

The Sixth Circuit has held at the summary judgment stage, the burden of proof is on the Plaintiff to demonstrate by a preponderance of the evidence that a Defendant's reason is pretext.

To establish pretext, plaintiff must show by a preponderance of the evidence either that the proffered reasons had no basis in fact, did not actually motivate the discharge, or were insufficient to motivate the discharge. *See Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1083 (6th Cir.1994). While plaintiff emphasizes his favorable ratings and merit pay increases, he was an "average +" performer overall about whom there were performance concerns which predated any protected activity. Further, during the "clean slate" discussion with Fox, Colitti set expectation levels with plaintiff including that he "get on the team" and stop disruptive behaviors. Plaintiff was not meeting his employer's legitimate expectations at the time of his discharge.

*Fox v. Certainteed Corp.*, 198 F.3d 245 (6th Cir. 1999).

Plaintiff has no evidence that the Defendant's legitimate, non-discriminatory and non-retaliatory reason for her discipline and discharge was pretextual. As Reitz admitted, the City had been reprimanding Reitz for tardiness before she ever filed a sexual harassment complaint. The alleged harasser gave Reitz a raise within two weeks after she filed her complaint. Reitz has admitted she was late to work multiple times, and reprimanded multiple times. Reitz's own antagonistic conduct toward her co-workers by carrying and displaying her tape recorder daily, after the outside investigator found her complaint to be meritless, demonstrates that it was Reitz, not the City, who carried the hostile animus. Reitz cannot carry her burden, and the City is entitled to summary judgment.

**CONCLUSION**

For the foregoing reasons, the Defendant is entitled to summary judgment, and this case should be dismissed.

Respectfully submitted,

MOORE, RADER, CLIFT AND
FITZPATRICK, P.C.

By  s/Daniel H. Rader, IV B.P.R. No.025998
    DANIEL H. RADER, IV
    Attorneys for Defendant,
    City of Mt. Juliet
    P. O. Box 3347
    Cookeville, TN  38502
    (931-526-3311)
    B.P.R. No. 025998


    MOORE, RADER, CLIFT AND
    FITZPATRICK, P.C.

By  s/Richard Lane Moore B.P.R. No.018815
    RICHARD LANE MOORE
    Attorneys for Defendant,
    City of Mt. Juliet
    P. O. Box 3347
    Cookeville, TN  38502
    (931-526-3311)
    B.P.R. No. 018815


    MOORE, RADER, CLIFT AND
    FITZPATRICK, P.C.

By  s/Daniel H. Rader, III B.P.R. No.002835
    DANIEL H. RADER, III
    Attorneys for Defendant,
    City of Mt. Juliet
    P. O. Box 3347
    Cookeville, TN  38502
    (931-526-3311)
    B.P.R. No. 002835

<u>CERTIFICATE OF SERVICE</u>

       I hereby certify that a copy of the foregoing pleading was filed electronically on September 28, 2009.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. Mail.  Parties may access this filing through the Court's electronic filing system.

       Ms. Kathryn Reitz
       2425 Keeling Drive
       Mt. Juliet, TN 37122

       Dated this the 28th day of September, 2009

                          By <u>s/Daniel H. Rader IV B.P.R. No.025998</u>
                               DANIEL H. RADER IV
                               Attorneys for Defendant,
                               City of Mt. Juliet
                               P. O. Box 3347
                               Cookeville, TN  38502
                               (931-526-3311)
                               B.P.R. No. 025998