# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE NASHVILLE DIVISION

| | | |
|---|---|---|
| KATHRYN REITZ and BOBBIE MCDONALD, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 3:08-cv-0728 Judge Trauger |
| CITY OF MT. JULIET, | ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by defendant City of Mt. Juliet (Docket No. 63), plaintiff Kathryn Reitz's response (Docket No. 93), and the defendant's reply (Docket No. 99).[1]  For the reasons discussed herein, the defendant's motion will be granted in part and denied in part.

## FACTS

Plaintiff Kathryn Reitz worked for the City of Mt. Juliet (the "City") as a clerk in the City's storm water division.[2]  She was hired on October 16, 2006.  The job was an entry-

---

[1] The court previously dismissed plaintiff Bobbie McDonald's claims, so the term "plaintiff" will refer only to Reitz.

[2] Unless otherwise noted, the facts are drawn from the defendant's Statement of Material Facts (Docket No. 64) and the plaintiff's response (Docket No. 95), the plaintiff's Statement of Material Facts (Docket No. 94), and related affidavits and exhibits.  Although facts are drawn from submissions made by both parties, on a motion for summary judgment, the court draws all reasonable inferences in favor of the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Brown v. United States*, 583 F.3d 916, 919 (6th Cir.

1

level position that required Reitz to answer phones, take information from citizens and developers, and receive, process, and file paperwork. Reitz's immediate supervisor was Gary Gaskin, the City's Storm Water Coordinator.

Reitz felt that the clerk position was "beneath [her] experience," but she took it because she expected that, after six months, she could apply for more advanced positions. (Docket No. 69, Ex. 1 at 3.) On April 5, 2007, as the six-month mark neared, Reitz filed an internal sexual harassment complaint. She alleged that: (1) on several occasions, Gaskin had made unwelcome sexual comments; (2) she had been treated less favorably because of her gender with regard to her starting salary, the vacation and bereavement leave she received, and certain "verbal counseling" about how to use the time clock; (3) she received a sexually oriented email from a female co-worker, which contained a cartoon depicting the unpleasantness of a mammogram; (4) the City's public works director, Hatton Wright, created an intimidating environment for his employees; (5) a female co-worker had been referred to by a male co-worker as "menopausal"; and (6) the City had not properly handled a spider infestation in the office. In her affidavit, Reitz claims that a co-worker told her, in Gaskin's presence, that she would be fired if she filed a sexual harassment complaint and that "Gaskin did not deny or disagree. He remained silent." (Docket No. 96, Ex. 1 ¶ 17.)

In response to Reitz's complaint, the City hired Kristin Berexa, a lawyer from the Nashville firm Farrar & Bates, LLP, to conduct an internal investigation. Berexa interviewed dozens of employees and produced a 17-page memorandum detailing her findings. She

_____

2009).

2

ultimately concluded that no hostile environment existed and that Reitz had not been discriminated against. Reitz's complaints about Gaskin were not included in her written complaint; instead, they surfaced during her interviews with Berexa. Berexa's memorandum noted that Gaskin and Reitz's husband "had somewhat of a friendship relationship outside of work."[3] (Docket No. 69, Ex. 1 at 42; Docket No. 96, Ex. 8 at 12.)

A tense atmosphere developed after Reitz filed her complaint. Reitz began taking photos in the office and carrying a tape recorder in an effort to document any perceived mistreatment by her co-workers or supervisors. She claims that someone left dead spiders on her desk, presumably to exploit her fear of spiders. She also claims that, on two occasions, a pick-up truck was parked directly on the path to her car. Once the truck had a "mutilated turkey foot" tied to it, and the other time it carried a "dead deer carcass." (Docket No. 96, Ex. 1 ¶ 15.)

Besides these incidents, Reitz alleges that Gaskin began retaliating against her. Both parties agree that, in the months after Reitz filed the sexual harassment complaint, she received frequent reprimands for tardiness and disorganization. Reitz claims that Gaskin unfairly set her up to fail and that she only received the reprimands because she was under increased disciplinary scrutiny. She claims that the reprimands "did not start until [she] filed the sexual harassment complaint." (Docket No. 96, Ex. 1 ¶ 10.) The City, in contrast, presents evidence that Reitz was reprimanded for being a sub-par employee before she filed her complaint, that her reprimands were deserved, and that her termination was motivated solely by her poor job performance.

At her deposition, Reitz admitted that she was, in fact, repeatedly tardy to work. But in

---

[3] Both parties have attached this portion of Berexa's report to their filings.

the affidavit attached to her summary judgment response brief, Reitz claims that the regular tardiness reprimands did not start until after she filed the complaint and that other employees "were not subject to the same treatment with tardiness." (Docket No. 96, Ex. 1 ¶ 5.) According to Reitz, the City allowed employees to call in if they expected to be late and gave employees a grace period, allowing them to clock in up to seven minutes late. Reitz claims that she was not given the benefit of these policies after she filed her complaint.

Reitz also points to problems with her time cards. Gaskin was responsible for replacing employees' time cards every two weeks. Reitz claims that, on these days, Gaskin often hid her card, requiring her to go to a supervisor to receive a new one. By the time she was able to check in with her new time card, she was "technically" late. (Docket No. 96, Ex. 1 ¶ 6.) Reitz claims that she received tardiness reprimands on those days, even though she arrived at work on time. She claims that these problems eventually caused City Manager Randy Robertson to relieve Gaskin of his responsibility for handling Reitz's cards. In his own affidavit, Gaskin denies that he ever hid Reitz's time card. (Docket No. 66 at 1.)

Reitz further states in her affidavit that the City twice moved her to new buildings and failed to give her keys, while other, similar employees received keys. Reitz was forced to wait for someone to let her in, causing her to be late and leading to more tardiness reprimands. She claims that, on some occasions, "[she] was able to see Gary Gaskin inside the building while [she] was knocking and he refused to answer the door until [she] would be considered tardy." (Docket No. 96, Ex. 1 ¶ 7.) Furthermore, Reitz says she was not allowed to remove certain necessary files from the previous buildings. She claims that she was reprimanded when she did

4

not have these files in the new building, as well as when she left her desk to work on them in the old buildings.

Reitz's job required her to work with files that required Gaskin's signature or approval. Reitz claims that, before her complaint, Gaskin "kept his door open to facilitate expediency and communication in the work place." (Docket No. 96, Ex. 1 ¶ 11.) After the complaint, "Gaskin closed his door and kept his door locked. In addition, he refused to speak to [Reitz] and instead wrote excessive notes in red ink and placed them on the files and on [her] desk." (*Id.*) Reitz claims that, although the notes were confusing and incomplete, Gaskin refused to clarify them. As a result, she claims that she was unable to finish certain tasks, causing her to receive reprimands. Reitz further claims that, "[a]s time progressed, communication was effectively stopped and therefore [she] had no information necessary to adequately perform [her] job duties." (*Id.* ¶ 13.) Gaskin denies that he ever treated Reitz improperly or that any of his actions were motivated by a retaliatory purpose. (Docket No. 66 at 2-3.) Robertson's affidavit also states that Reitz was never harassed or retaliated against. (*See* Docket No. 65.)

In a letter dated August 14, 2007, Sheila Luckett, the Acting City Manager, told Gaskin that "[c]onflicts between Mrs. Reitz and yourself have been discussed with Mrs. Reitz." (Docket No. 96, Ex. 2.) Luckett reminded Gaskin that the City "expects all employees to work together in a harmonious, productive and professional manner," and that "[his] cooperation is expected and appreciated." (*Id.*)

In November 2007, Reitz received a four-day suspension from Robertson for chronic tardiness. In a letter, Robertson stated that the suspension was premised on her "documented

5

deficiencies," including "warnings, both verbal and written." (Docket No. 96, Ex. 7.) Reitz claims that, on the day she was suspended, she arrived at work on time, but that she again had a missing time card and was "technically late" by the time she received a replacement. (Docket No. 96, Ex. 1 ¶ 9.)

In January 2008, Marlin Keel replaced Hatton Wright as the City's Public Works Director. Keel soon created a "management action plan" to sort out various problems in the storm water division, but he claims that Reitz "did not embrace the opportunity for a 'fresh start.'" (Docket No. 67 at 1.) Reitz admitted in her deposition that she went into a meeting about the plan with the attitude that the City was retaliating against her for filing the harassment complaint. (Docket No. 69, Ex. 1 at 36-37.)

To support her assertion that she was a competent worker, Reitz has attached a letter dated March 3, 2008 from contractor Joe Hukowicz, which Keel had forwarded to Gaskin and Reitz. In the letter, Hukiwocz wrote that Reitz was "a life saver": "She is to be commended for her efficient professionalism as a city servant throughout the many problems we encountered . . . ." (Docket No. 96, Ex. 5 at 2.)

This praise was not enough to save Reitz's job. On April 1, 2008, Keel sent out a memorandum to all public works employees concerning tardiness, explaining that employees must clock in on time. The very next day, Reitz sent Keel an email telling him that she had clocked in late that morning. On April 21, 2008, Keel denied a merit raise that Reitz had requested, citing her continuing performance problems. Finally, on April 25, 2008 – just over a year after Reitz filed the sexual harassment complaint – Robertson accepted Keel's

recommendation to fire Reitz.

<u>ANALYSIS</u>

Reitz's complaint asserts claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and the defendant has filed a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. The plaintiff's response brief abandons any hostile environment or gender discrimination claims she might have (*see* Docket No. 68 at 13-17; Docket No. 93 at 5), so the court will address only her retaliation claim.

**I.     Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) requires the court to grant a motion for summary judgment if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the [plaintiff]." *Moldowan*, 578 F.3d at 374.

"'[T]he judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "the mere existence of a scintilla of evidence

7

in support of the plaintiff's position will be insufficient," and the plaintiff's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the plaintiff. *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II. Reitz's Affidavit

Reitz's primary source of evidence is her own affidavit, which is attached to her response memorandum. As an initial matter, the court will decide whether it should consider this affidavit. The defendant argues that, because the affidavit contradicts Reitz's earlier deposition testimony, the court should disregard it.[4] (Docket No. 99 at 8-12.)

Generally, a party cannot create a genuine dispute of material fact by attaching an affidavit that contradicts prior deposition testimony. *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906 (6th Cir. 2006); *Penny v. United Parcel Serv.*, 128 F.3d 408, 415 (6th Cir. 1997). A court should strike a "directly contradictory" affidavit "unless the party opposing summary judgment provides a persuasive justification for the contradiction." *Aerel*, 448 F.3d at 906. "If, on the other hand, there is no direct contradiction, then the district court should not strike or disregard that affidavit unless the court determines that the affidavit constitutes an attempt to

---

[4] The defendant did not file a response to the plaintiff's Statement of Undisputed Facts, as required by Local Rule 56.01(d). Ordinarily, the court would treat this failure to respond as an admission of the facts contained in the plaintiff's statement. LR 56.01(g). But here, the defendant has challenged the propriety and admissibility of each document cited in the statement. (Docket No. 99 at 8-12.) Primarily, the statement cites to Reitz's affidavit, which the defendant asks the court to disregard. Because the defendant has challenged all of the underlying documents, the court will treat the defendant's reply memorandum as a denial of the plaintiff's Statement of Undisputed Facts.

8

create a sham fact issue." *Id.* (citation omitted).

One main theme of the plaintiff's affidavit is that she started receiving regular reprimands only after she filed her sexual harassment complaint. Reitz states that her "only problem prior to filing [her] sexual harassment complaint was with the use of the time clock." (Docket No. 96, Ex. 1 ¶ 5.) The defendant claims that this contradicts the following deposition testimony:

> Q.     All right. And so if you told her that Gary had reprimanded
>        you about your time card weekly for months, that would
>        have been true, right?
>
> A.     If I told her that, yes.
>
> Q.     All right.
>
> A.     If that's what's in there and I wrote it, yes.
>
> Q.     All right. And if you wrote that to her on May 17th, 2007,
>        then that indicates that he had been doing that for months,
>        including the period of time prior to your April 5th, 2007,
>        complaint, right?
>
> A.     Right.
>
> Q.     All right. This is that document, isn't it, Ms. Reitz, that
>        you produced in your answers to interrogatories?
>
> A.     To the best of my knowledge, yes.

(Docket No. 69, Ex. 1 at 13-14.) This is the only deposition testimony offered by the defendant on the issue of Reitz's pre-complaint reprimands.

This testimony, however, is not very clear. The defendant has redacted everything immediately before and after the above-quoted segment, removing any context that the

9

surrounding testimony might offer.[5]  The testimony refers to a document written by the plaintiff and sent to someone identified only as "her."  Even though this document was presumably an exhibit at the deposition, the defendant has not attached it.[6]  Furthermore, in the quoted testimony, Reitz never actually agreed that she was reprimanded weekly for tardiness before April 2007.  Instead, she merely agreed that the document was accurate.  Without the document itself or the surrounding testimony, it is unclear what, exactly, the plaintiff admitted during her deposition; it is possible that the document simply referred to the time-clock problems that Reitz mentions in her affidavit.  Because of this lack of clarity, the court finds that the plaintiff's affidavit does not directly contradict her deposition testimony.

The defendant also argues that the court should disregard the "numerous excuses" the plaintiff's affidavit offers for her tardiness.  (Docket No. 99 at 9.)  The City claims that these excuses contradict testimony in which Reitz agreed that she had "been late to work multiple times" and that "Gaskin reprimanded [her] for being late to work multiple times."  (Docket No. 69, Ex. 1 at 16.)  But this testimony is not, of course, inconsistent with excuses for Reitz's tardiness.  By definition, the excuses admit that the plaintiff clocked in late and explain *why* she was late on those occasions.

Finally, the defendant argues that Reitz admitted at deposition that she received a raise on April 16, 2007, contradicting her affidavit's claim that she was denied every post-complaint

---

[5] The defendant did this for all of its deposition excerpts.  Some contain as few as three lines of text.

[6] Nor, the court notes, has the defendant attached any records from Reitz's personnel file, which would document the reprimands she received.

merit raise that she applied for. But the Reitz affidavit explicitly recognizes that she received a "six month automatic merit raise which took effect two weeks after [she] filed the complaint." (Docket No. 96, Ex. 1 ¶ 2.) Because the defendant cannot point to any actual, direct contradictions between the plaintiff's affidavit and her testimony, the court will consider the affidavit in deciding the instant motion.[7]

## III.    Title VII Retaliation Claim

The plaintiff asserts that the City retaliated against her for filing her sexual harassment complaint, in violation of Title VII. *See* 42 U.S.C. § 2000e-3(a). The defendant argues that it fired Reitz for legitimate, non-retaliatory reasons and that Reitz cannot satisfy her evidentiary burden.

---

[7] Reitz has also attached two documents – an email and a draft letter – allegedly authored by Chris Sorey, who examined Reitz's personnel file for evidence of retaliation. (*See* Docket No. 96, Exs. 3-4.) The defendant argues that these unsworn documents, which are offered for the truth of the assertions contained therein, are hearsay. (Docket No. 99 at 9.) Although the plaintiff's response memorandum states that Sorey was a City employee (Docket No. 93 at 3), there is no affidavit to that effect. The defendant claims that Sorey was not an employee (Docket No. 99 at 8-9), and the email itself calls Sorey a "resident" and not a "public servant." (Docket No. 96, Ex. 4.) Because it does not appear that Sorey was the employee or agent of the City, the documents are hearsay, and the court will not consider them. *See Alexander v. CareSource*, 576 F.3d 551, 559 (6th Cir. 2009) (noting that on summary judgment, the court must disregard hearsay evidence).

The defendant further argues that the other letters and emails attached by the plaintiff are unauthenticated and inadmissible. (Docket No. 99 at 8-9.) The court will not consider unauthenticated documents on summary judgment, *Alexander*, 576 F.3d at 558, so the court will disregard the email and letter from Marlin Keel. (*See* Docket No. 96, Exs. 5-6.) But because the letter from Acting City Manager Sheila Luckett, the letter from contractor Joe Hukowicz, and the memorandum from Randy Robertson all appear to be on letterhead (*see* Docket No. 96, Exs. 2, 5, 7), they are self-authenticating under Federal Rule of Evidence 902(7). *Alexander*, 576 F.3d at 561. In any event, these documents are not necessary to the court's decision, so any dispute over authentication is academic.

### A.     Prima Facie Case

In assessing a Title VII retaliation claim, the court employs the framework laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  First, to establish a prima facie claim, the plaintiff must show that: (1) she engaged in activity that Title VII protects; (2) the defendant knew about this activity; (3) the defendant subsequently took an employment action adverse to the plaintiff; and (4) there is a causal connection between the protected activity and the adverse employment action.  *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 542 (6th Cir. 2003); *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008).

If the plaintiff establishes a prima facie case, the burden of production "shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse action."  *Abbott*, 348 F.3d at 542 (citation omitted).  If the defendant is able to do this, the plaintiff must then show that the non-discriminatory reason "was a mere pretext for discrimination by establishing that the proffered reason: 1) has no basis in fact; 2) did not actually motivate the adverse action; or 3) was insufficient to motivate the adverse action."  *Id.*  "If the plaintiff demonstrates that the defendant's proffered, non-discriminatory reason is a pretext, then the fact finder may infer unlawful retaliation.  Throughout the entire McDonnell-Douglas framework, the plaintiff bears the burden of persuasion."  *Id.* (citations omitted and emphasis removed).

Here, there is no dispute that Reitz engaged in activity protected by Title VII or that the City knew of this activity.  Thus, the court will examine whether the City took an adverse employment action against Reitz that was causally connected to her sexual harassment complaint.

The defendant treats the April 2008 firing as the relevant adverse action.  But in

*Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the Supreme Court

took a broad view of what constitutes a materially adverse action in the context of a Title VII

retaliation claim: "[A] plaintiff must show that a reasonable employee would have found the

challenged action materially adverse, which in this context means it well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination."  *Id.* at 68 (citation

omitted).  The determination of whether an action is materially adverse "depends on the

circumstances of the particular case, and should be judged . . . considering all the

circumstances."  *Id.* at 71 (citation omitted).

Here, Reitz provides evidence that Gaskin refused to talk to her and prevented her from

retrieving files from certain buildings, making it practically impossible to do her job.  This led to

reprimands for disorganization.  There is also evidence that Gaskin hid Reitz's time card,

sometimes refused to let her into the building, and applied clock-in policies unequally, leading to

tardiness reprimands.  These reprimands led directly to Reitz's suspension in November and to

her eventual termination.  A reasonable employee might well be dissuaded from reporting

harassment if she knows that her supervisor will impede her job performance, resulting in

frequent and unfair reprimands.  *Cf. Burlington*, 548 U.S. at 71 (noting that making an

employee's duties more "arduous" and less "eas[y]" or "agreeable" can discourage harassment

complaints).  Thus, in addition to Reitz's termination, the court finds that the reprimands and

13

Gaskin's alleged conduct constitute a materially adverse action.[8]  *See Sanford v. Main St. Baptist Church Manor, Inc.*, 327 Fed. Appx. 587, 599 (6th Cir. 2009) (finding that the district court erred in determining that a supervisor's write-ups, "which occurred within a relatively short period of time after [the plaintiff's] complaints . . . of [the supervisor's] sexual advances were not in fact materially adverse"); *cf. Jones v. Johanns*, 264 Fed. Appx. 463, 469 (6th Cir. 2007) (finding no material adverse action when the plaintiff received only three reprimand letters, two of which arguably did not even contain reprimands, over the course of three-and-one-half years).

The question then becomes whether Reitz has shown a causal connection between the filing of the sexual harassment complaint and the subsequent reprimands.  "'To show causation, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken in the absence of the protected conduct.'" *Lamer v. Metaldyne Co. LLC*, 240 Fed. Appx. 22, 29 (6th Cir. 2007) (quoting *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 381 (6th Cir. 2002)).  "When an employee is disciplined in close proximity to his or her protected activity, such proximity provides highly probative evidence of a causal connection between the adverse employment action and the protected activity." *Howington v. Quality Rest. Concepts, LLC*, 298 Fed. Appx. 436, 446 (6th Cir. 2008) (citation

---

[8] Reitz offers evidence that dead spiders were placed on her desk and that a pick-up truck decorated with dead animal parts twice blocked the pathway to her car.  But there is nothing suggesting that Gaskin, as opposed to a co-worker, did this.  An employer is liable for a co-worker's retaliatory conduct only if a supervisor or management employee has knowledge of the retaliatory behavior and "condoned, tolerated, or encouraged the acts of retaliation," or "responded so inadequately that the response manifests indifference or unreasonableness under the circumstances."  *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 347 (6th Cir. 2008).  Because there is no evidence that a supervisor knew of these actions, the City cannot be held liable for them.

14

omitted); *see also Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 524 (6th Cir. 2008).

Causation can also be inferred if an employee faces higher disciplinary scrutiny than similarly

situated employees, *Little v. BP Exploration & Oil Co.*, 265 F.3d 357, 364-65 (6th Cir. 2001), or

if an employee faces higher scrutiny than she faced before filing a harassment complaint.

*Cantrell v. Nissan N. Am. Inc.*, 145 Fed. Appx. 99, 106 (6th Cir. 2005); *Lamer*, 240 Fed. Appx.

at 32-33.

      In her affidavit, the plaintiff provides evidence that Gaskin tacitly agreed with a co-

worker's statement that Reitz would be fired if she filed a sexual harassment complaint. She also

offers evidence that Gaskin became antagonistic, and that she began receiving regular

reprimands, only *after* she filed her complaint.[9] There is no evidence of when, exactly, Reitz

was first reprimanded after her April 2007 complaint, but it must have started in the weeks or

months following the filing: by August 2007, the Acting City Manager had sent Gaskin a letter

about "conflicts" between Gaskin and Reitz (Docket No. 96, Ex. 2), and by November 2007,

Reitz was suspended because of her often-documented tardiness. Taking all of this evidence

together, the court finds that the plaintiff has sufficiently shown a causal connection between her

complaint and the materially adverse action. *See Harrison v. Metro. Gov't of Nashville &*

---

      [9] According to Berexa's internal investigation memorandum, Reitz complained that "she was verbally counseled regarding her time clock usage more so than a male employee in her department." (Docket No. 96, Ex. 8 at 16.) Apparently, Reitz had problems properly placing her time card in the clock. "According to Mr. Gaskin, on three separate occasions he verbally counseled Ms. Reitz regarding time clock issues." (*Id.*) Gaskin also told Berexa that Reitz "had difficulty complying with her regular work hours." (*Id.*) Although this suggests that Reitz had tardiness issues before filing her complaint, it does not show that Reitz received any pre-filing written reprimands or any pre-filing reprimands regarding tardiness.

15

*Davidson County, Tenn.*, 80 F.3d 1107, 1119 (6th Cir. 1996), *cited in Little*, 265 F.3d at 364

(holding that the plaintiff established a prima facie case, even though his termination occurred

one year and three months after he filed an EEOC charge, because there was additional evidence

regarding retaliation).

### B.    Evidence of Pretext

As required by the *McDonnell Douglas* framework, the defendant has given a legitimate,

non-discriminatory reason for the reprimands and termination – namely, that Reitz was a poor

worker who was chronically tardy and disorganized.  In rebuttal, the plaintiff must show that this

claimed motive was pretextual.

The plaintiff can meet this burden by showing "circumstances which tend to prove that

an illegal motivation was more likely than that offered by the defendant."  *Lamer*, 240 Fed.

Appx. at 31 (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir.

1994)) (emphasis removed).  The evidence used to show pretext can be the same evidence used

to establish a causal connection between the plaintiff's protected activity and the materially

adverse action; evidence of a causal connection, "if sufficiently strong, also necessarily rebuts a

proffered legitimate, non-discriminatory reason for the adverse action."  *Cantrell*, 145 Fed.

Appx. at 107, 108 n.2.

Here, the evidence that the court has already discussed – in particular, the evidence that

Reitz started receiving frequent reprimands only after she filed her complaint – is sufficient to

show that Gaskin's conduct was driven by a desire to retaliate.  Sixth Circuit case law supports

this conclusion.

16

For example, in *Lamer*, the plaintiff served on a peer-review panel that evaluated the firing of a co-worker. 240 Fed. Appx. at 26. The plaintiff had previously been disciplined for making a homophobic remark at work and had signed a "Last Chance Agreement" ("LCA") providing that he was subject to immediate discharge if he violated any company policy. *Id.* at 25. The plaintiff claimed that his supervisor told him not to get involved in the peer-review process; nevertheless, he served on the panel, which determined that the co-worker's termination was unjust. *Id.* The plaintiff later discussed the co-worker's firing with the Ohio Civil Rights Commission. *Id.*

Throughout his tenure at the job, the *Lamer* plaintiff had "exhibited a pattern of tardiness and absenteeism." *Id.* at 24. Generally, for tardiness infractions, the employer had a four-step progressive discipline procedure. Before serving on the panel, the plaintiff had received a verbal warning regarding his tardiness, which was Step 1. *Id.* at 25-26. Shortly after serving on the panel, the plaintiff received a negative performance review because of his persistent tardiness, and over the next five months, he received tardiness reprimands that constituted Steps 2 through 4 of the discipline procedure. *Id.* at 27. After the Step 4 reprimand, the plaintiff was fired. He requested a peer review, which the employer denied because of the LCA. *Id.* at 33.

The district court dismissed the *Lamer* plaintiff's retaliation claim on summary judgment, but the Sixth Circuit reversed. It found that the plaintiff had established a prima facie case, because he had been warned not to get involved in the peer review and because the tardiness discipline occurred within five months of his involvement. *Id.* at 30. The court also found that the plaintiff had sufficiently shown that his termination was motivated by retaliation, not by

17

legitimate job-performance issues.  The plaintiff did not dispute that he was, in fact, tardy when he was reprimanded, and the employer offered evidence it had reprimanded the plaintiff for tardiness even before he served on the panel.  *Id.*  But the court noted that the employer "did not terminate his employment pursuant to the LCA for any of the many policy violations that he committed before engaging in protected conduct."  *Id.* at 32.  The fact that the employer disciplined and fired the employee only *after* he engaged in protected conduct was enough to persuade the court that the defendant's proffered motive was pretextual.  *Id.* at 33.  The parallels to the instant case are clear – even if Reitz was consistently tardy throughout her tenure at the City, she has presented evidence that she was regularly reprimanded and fired for it only after she filed her complaint.

*Cantrell* is similar.  In that case, the plaintiff's mental illness led to recurring behavioral problems in the workplace.  145 Fed. Appx. at 101-02.  The employer tolerated the plaintiff's inability to get along with her co-workers for years.  *Id.* at 106.  But two months after the plaintiff filed an EEOC charge, the employer "determined that her 'history of gross misconduct' required her termination."  *Id.*  Because the plaintiff "was treated so differently before and after her EEOC filing," she had sufficiently raised the inference "that her protected activity was the likely reason for the adverse action."  *Id.* (citation omitted).  The court explained: "[E]vidence that a defendant employer treated a plaintiff employee differently from identically situated employees who did not engage in protected activity is relevant.  Applying similar logic, we have implied that where an employer treats an employee differently after she [engages in protected conduct] than before she had done so, a retaliatory motive may be inferred."  *Id.* at 105-06

18

(citations omitted).  Here, Reitz's evidence shows that she was treated much differently after she filed her complaint.

In its response brief, the defendant points to this court's decision in *Evans v. Prospect Airport Services, Inc.*, No. 3:05-0368, 2007 U.S. Dist. LEXIS 11106 (M.D. Tenn. Feb. 13, 2007)*, aff'd*, 286 Fed. Appx. 889 (6th Cir. 2008).  In *Evans*, the plaintiff worked at an airport as a passenger service assistant, pushing passengers in wheelchairs to and from the terminal.  286 Fed Appx. at 889.  In his first three years of employment, he received three warnings for performance issues.  He then filed an EEOC charge alleging racial discrimination.  In the following 18 months, he was issued more than ten performance-related warnings and suspensions and was ultimately fired.  *Id.* at 890-91.  Both this court and the Sixth Circuit found that there was no causal connection between the EEOC charge and the firing.[10]  This court was persuaded by the fact that the plaintiff "admitted to committing the underlying offense for the great majority of citations he has received," and that the defendant presented evidence of three prior citations.  2007 U.S. Dist. LEXIS 11106 at *17.  The Sixth Circuit further noted that the plaintiff failed to identify any aspects of the reprimands, other than their timing, suggesting that they were motivated by retaliation.  286 Fed. Appx. at 896.  He also "failed to produce any evidence to suggest that his workplace conduct was being more closely scrutinized than similarly situated employees who had not filed EEOC complaints."  *Id.*

In contrast, Reitz offers evidence that her reprimands were unwarranted, that Gaskin

---

[10] Although the *Evans* decisions focused on the lack of a causal connection, as explained earlier, the same evidence is relevant to the issue of pretext.  *Cantrell*, 145 Fed. Appx. at 108 n.2.

purposely caused her tardiness and interfered with her ability to process files, that Gaskin

refused to communicate with her, that Gaskin tacitly agreed with a suggestion that she would be

fired if she filed her complaint, and that certain attendance policies were applied unequally to

her.[11]  Beyond mere "conclusory allegations," Reitz's affidavit "set[s] forth specific facts"

implying that Gaskin acted with a retaliatory motive.  *See id.*  Because this case is closer to

*Lamer* and *Cantrell* than it is to *Evans*, the court finds that Reitz has sufficiently rebutted the

City's proffered legitimate motive.

---

[11] This evidence also makes the defendant's reference to this court's decision in *Eades v. Brookdale Senior Living, Inc.*, No. 3:07-00913, 2008 U.S. Dist. LEXIS 96182 (M.D. Tenn. Nov. 25, 2008), unavailing.  In *Eades*, the only evidence offered by the plaintiff to show pretext was (1) the temporal proximity of the protected activity and the plaintiff's termination, and (2) the defendant's supposed "shifting rationale" for his firing.  *Id.* at *21-23.

**<u>CONCLUSION</u>**

It may very well be true that Reitz's reprimands, suspension, and termination were motivated solely by her poor job performance. But the evidence submitted by the parties on the central issue of this case – whether Reitz was treated differently after she filed her complaint – essentially consists of the affidavits of Reitz, Gaskin, and Robertson, which are in conflict. Therefore, genuine issues of material fact prevent the court from granting summary judgment as to the plaintiff's retaliation claim. Because the plaintiff has abandoned any hostile environment or gender discrimination claims she might have, the court will grant the defendant's Motion for Summary Judgment as to those claims.

An appropriate order will enter.


_____
ALETA A. TRAUGER
United States District Judge

21